## UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

| | |
|---|---|
| Provitas, LLC,<br><br>　　　　　Plaintiff,<br><br>v.<br><br>Quality Ingredients Corporation,<br><br>　　　　　Defendant. | Case No. 22-cv-00013 (SRN/DTS)<br><br><br>**MEMORANDUM OPINION AND ORDER** |

Christopher L. Goodman and Kenya C. Bodden, Thompson, Coe, Cousins & Irons, LLP, 408 Saint Peter Street, Suite 510, Saint Paul, MN 55102, for Plaintiff.

Nicole R. Weinand, Law Offices of John C. Syverson, 701 South Xenia Avenue, Suite 425, Golden Valley, MN 55416, for Defendant.

SUSAN RICHARD NELSON, United States District Judge

　　　This matter is before the Court on Defendant Quality Ingredients Corporation's ("QIC") Motion for Summary Judgment [Doc. No. 65]. For the reasons set forth below, the Court will grant QIC's Motion.

## I.　BACKGROUND

　　　Plaintiff Provitas, LLC ("Provitas"), a Texas-based company, supplies wholesale vitamins and nutrients to producers of food, dietary supplements, and personal care products. (Compl. [Doc. No. 1] ¶ 3, 18.) Defendant QIC, a Minnesota-based company, receives raw liquid ingredients from its customers which it then processes, mixes, and dries into powders. (Def.'s Mot. to Dismiss [Doc. No. 16], Ex. 1 (Day Affidavit) ¶ 3–5.) This

1

dispute arises from Provitas' order for QIC to process liquid vitamin D2 into its powder form. (Compl. ¶ 1, 8–9, 18–38.)

### A.    Factual History

The parties' relationship dates to March 2014, when they entered a Mutual Confidentiality Agreement to explore doing business together. (Bodden Decl. [Doc. No. 72], Ex. A-1 (Mutual Confidentiality Agreement).) Among other terms, the Mutual Confidentiality Agreement contains a forum selection clause requiring adjudication in Minnesota as well as a choice-of-law clause providing that: "The legality, validity, enforceability and interpretation of this Agreement and the relationship of the parties hereunder shall be governed by the laws of the state of Minnesota, without giving effect to the principles of conflict of laws." (*Id.* ¶ 12.)

In June 2015, QIC signed a Continuing Product Guaranty applying to all future shipments and deliveries to Provitas. (Bodden Decl., Ex. A-3 (Continuing Product Guaranty) ¶ 1.) Since that time, Provitas has placed at least seven orders with QIC for ingredient processing. (Bodden Decl., Ex. A (Weber Decl.) ¶ 9.) The Continuing Product Guaranty provides that "no article comprising any shipment or other delivery" from QIC to Provitas is:

> adulterated or misbranded within the meaning of the Federal Food, Drug and Cosmetic Act (including its Food and Color Additive Amendments) or within the meaning of any practically similar state or municipal law, or is an article which may not, under such Act or law, be introduced into interstate or intrastate commerce.

(Continuing Product Guaranty ¶ 1.) The Continuing Product Guaranty also contains an indemnity provision:

2

> The undersigned further guarantees to indemnify, hold harmless, and defend [Provitas] with respect to any claim made upon it for injury from the use of any article sold by Quality Ingredients Corporation, if such claim is prima facie due to its fault and provided it is promptly notified of such claim and is permitted to deal therewith in its own discretion and through its own representative or attorney.

(*Id.* ¶ 4.)

In March 2017, Provitas' customer DSM Nutritional Products ("DSM") placed an order with Provitas for vitamin D2 powder. (Weber Decl. ¶ 14; First Weinand Affidavit [Doc. No. 67], Ex. 1-A (DSM Purchase Order).) As a result, on May 18, 2017, Provitas placed an order with QIC for the processing of liquid vitamin D2 as well as liquid vitamin D3, among other ingredients. (Weber Decl. ¶ 10; Bodden Decl., Ex. A-4 (Provitas Purchase Order).) At the time of DSM's order, Provitas did not know the "intended purpose for the Vitamin D2 powder, or who the ultimate consumer would be after supplying [it] to [DSM]." (First Weinand Affidavit, Ex. 3 (Pl.'s Resps. to Def.'s Second Set of Interrogs.) at 4.) QIC likewise "did not know who the Vitamin D2 powder was going to." (First Weinand Affidavit, Ex. 4 (Def.'s Resps. to Pl.'s Second Set of Interrogs.) at 5.)

Before shipping the ingredients to QIC, Provitas tested the vitamin D2 to confirm its purity, setting aside and storing a small sample. (Weber Decl. ¶ 11, 18.) It then provided QIC with the liquid vitamins and the specifications for processing them, including the sequence of ingredient processing, the cleaning protocol to be performed between each ingredient, and the final ingredient formulations. (Day Affidavit ¶ 17–18, 20; Weber Decl. ¶ 10–11.)

3

This case implicates two different cleaning protocols known as a "dry clean" and a "Clean in Place" ("CIP"). The former involves vibrating and dusting the processing equipment to remove excess product; the latter involves fully washing the machinery, among other steps. (Weber Decl. ¶ 17, 20; Bodden Decl., Ex. C (Pl.'s Banken Dep.)[1] at 9:18–22, 13:2–15.) Although the record does not elaborate on the steps involved in a CIP, for the purposes of this order it suffices to note that a dry clean involves less cleaning than a CIP. As QIC attested:

> If a customer wants zero of one of their products to follow on to subsequent of their products run in sequence, they will direct a full CIP clean between the products. If they prefer to save money by having us clean less, they will specify something less than a full CIP clean between their products, knowing that there will be carryover of one product to the next.

(Def.'s Resps. to Pl.'s Second Set of Interrogs. at 4.)

QIC's Chief Executive Officer and President, Isabelle Day, attested that Provitas' designated protocols required "the manufacturing of Vitamin D3 before the manufacture of Vitamin D2 with only a dry clean between." (Day Affidavit ¶ 20.) Bob Banken, QIC's plant manager and designated corporate representative, also testified that he discussed performing a dry clean between ingredients with Provitas' President Mac Weber. (Weber Decl. ¶ 2; Pl.'s Banken Dep. at 3:22–24, 4:9–24, 9:5–10:22; *see also* Def.'s Resps. to Pl.'s Second Set of Interrogs. at 4 ("In the case of D2, Provitas directed the sequence of products

---

[1] Both Provitas and QIC provided excerpts of Mr. Banken's deposition but neither party provided the full transcript. To differentiate these non-overlapping excerpts, the Court refers to each as "Pl.'s Banken Dep." and "Def.'s Banken Dep." In addition, because the excerpt provided by Provitas does not contain the transcript's internal pagination, the Court cites the blue docket pagination at the top of each page.

run with dry cleans only between their products running back-to-back[.]").) According to

Mr. Banken, Mr. Weber understood the difference between a dry clean and a CIP because

of his experience with ingredient manufacturing. (Pl.'s Banken Dep. at 9:8–10:22.)

QIC performed a full CIP of its equipment before processing any of Provitas'

ingredients. (Def.'s Resps. to Pl.'s Second Set of Interrogs. at 3.) As for sequencing, QIC

began by spray-drying the liquid vitamin D3 into powder form. (Day Affidavit ¶ 20; Weber

Decl. ¶ 12.) Next, it performed a dry clean of its equipment and then completed the same

spray-drying process to convert the vitamin D2 into powder. (Day Affidavit ¶ 20; Def.'s

Resps. to Pl.'s Second Set of Interrogs. at 4.)

Provitas had provided labels for QIC to use on the packages of the processed

vitamins, including labels entitled "vitamin D2."[2] (Weber Decl. ¶ 13; First Weinand

Affidavit, Ex. 5 (Def.'s Banken Dep.) at 69:3–70:16.) The vitamin D2 label's "Directions"

instruct: "For manufacturing, processing, or repacking. Consult with a nutrition

professional for specific use recommendations." (Def.'s Banken Dep. at PROVITAS

001965.) The bottom of the label states: "Guaranteed By: Provitas, LLC" and includes

Provitas' Texas address and phone number. (*Id.*) QIC completed the labels by filling in the

lot number, the manufacture date, and the box number. (Def.'s Banken Dep. at 69:3–

---

[2] QIC submitted an example of one of these labels that was produced during Mr. Banken's deposition. (*See* Def.'s Banken Dep. at PROVITAS 001965 (label marked as "Exhibit 14"); Def.'s Banken Dep. at 69:1–6 (marking Exhibit 4 and identifying it as "Provitas' finished product label").) The label and the deposition refer to a manufacture date of May 3, 2017, which precedes the Purchase Order date of May 18, 2017. (Def.'s Banken Dep. at PROVITAS 001965; Def.'s Banken Dep. at 69:16–70:9; Provitas Purchase Order.)

70:16.) QIC shipped the processed ingredients back to QIC and Provitas subsequently shipped the vitamin D2 powder to its customer DSM. (Day Affidavit ¶ 21; Weber Decl. ¶ 13, 15.)

In August 2017, DSM notified Provitas that it had incorporated the vitamin D2 powder into a nutrient premix to fortify soy milk, ultimately intended for sale to vegetarian and vegan consumers. (Weber Decl. ¶ 15.) Testing performed on the soy milk premix revealed that it contained vitamin D3. (*Id.*; *see also* Pl.'s Banken Dep. at 19:5–12 (discussing an email from DSM stating that the vitamin D2 "contains approximately 10 percent of Vitamin D3").) Unlike vitamin D2, which is plant-derived, vitamin D3 is derived from animal products and is thus unsuitable for vegetarian and vegan diets. (Weber Decl. ¶ 8.) Consequently, DSM claimed that the soy milk premix could not be sold to its vegetarian and vegan customers and destroyed the entire batch. (*Id.* ¶ 15.) DSM demanded that Provitas pay for the destroyed soy milk premix and requested damages in excess of $1.8 million. (*Id.* ¶ 19; First Weinand Affidavit, Ex. 1 (First Amended NY Compl.) ¶ 29, 39, 45.)

Provitas attempted to resolve DSM's complaint informally. (*See* Weber Decl. ¶ 21.) As part of its investigation, Provitas sent for testing the liquid vitamin D2 sample that it had retained prior to QIC's processing and a sample of the processed vitamin D2 powder. (*Id.* ¶ 18.) This testing detected no vitamin D3 in the liquid sample, however it confirmed the presence of vitamin D3 in the powder sample.[3] (*Id.*)

---

[3] Provitas did not provide a copy of the test results, although it questioned Mr. Banken about them during his deposition. (*See* Pl.'s Banken Dep. at 23:11–27:23

On October 11, 2017, Mr. Weber emailed DSM a customer complaint form and wrote, in relevant part:

> In summary, our D2-400SD lot: 7124C3 was produced in specification and we confirmed finding normal batch-to-batch yield loss and carryover from the spray drying process when a dry-clean step is performed between products in a single campaign.
> We have implemented a corrective action to include a full CIP before all future D2-400SD campaigns.

(Second Weinand Affidavit [Doc. No. 75], Ex. 7 (Weber Email).)

In April 2018, DSM conducted a physical audit of QIC's operations to determine its compliance with food ingredient processing standards. (Weber Decl. ¶ 16; Bodden Decl., Ex. A-6 (Audit Report).) Overall, the Audit Report states that QIC's facility "is in very good condition with most of the required programs in place." (Audit Report at 1.) Under "Complaints and recalls," the Audit Report notes:

> 2017: 1 DSM complaint on Provitas supplied Material (D3 in D2-400SD product)
> Root cause – dry cleaning was done between D3 change-over to D2 product and D3 was not completely removed. Facility noted that no D2 product was made for DSM since complaint. Corrective action plan documented include a CIP before production of all future D2-400SD campaigns.

(Id. at 3–4; see also id. at 6 (repeating the same with the additional note that "QIC needs to work with Provitas to implement CIP cleaning before production of all DSM

---

(discussing percentages of vitamin D3 in boxes 1, 5, and 14).) While Mr. Banken at first accepted some of the calculations, he disputed the highest percentage of carryover measured. (Id. at 27:20–23 ("I think you – the math you're doing is fine for comparing that, but the math that is normally done also includes all the other ingredients, so the percentage is a lot less than what you are saying at 28 percent.").)

products.").) The Audit Report also notes that QIC and Provitas have no quality agreement or specification agreement in place and that they need to be implemented. (*Id.* at 5.)

### B.    Procedural History

This is the fourth lawsuit stemming from DSM's destroyed soy milk premix.

The first two did not last. On March 26, 2020, Provitas brought an action against both QIC and DSM in this District. (Def.'s Mot. to Dismiss, Exs. 2 (Complaint in 20-cv-00806 (NEB/DTS)), 3 (Notice of Voluntary Dismissal in 20-cv-00806 (NEB/DTS)).) The next day, DSM commenced an action against Provitas in the U.S. District Court for the District of New Jersey. (Def.'s Mot. to Dismiss, Ex. 4 (Complaint in 2:20-cv-03372 (WJM/MF)).) On June 5, the New Jersey district court dismissed DSM's action without prejudice pursuant to the parties' stipulation and Provitas voluntarily dismissed its Minnesota action the same day. (Def.'s Mot. to Dismiss, Exs. 3 (Notice of Voluntary Dismissal in 20-cv-00806 (NEB/DTS)), 5 (Stipulation of Dismissal Without Prejudice in 2:20-cv-03372 (WJM/MF)).)

In the meantime, on May 25, DSM sued Provitas in the U.S. District Court for the Northern District of New York seeking compensation for its losses. (*See* First Amended NY Compl.) Provitas filed a third-party complaint against QIC, which the court dismissed under Federal Rule of Civil Procedure 12(b)(2) for lack of personal jurisdiction. *DSM Nutritional Prods., LLC v. Provitas, LLC*, No. 1:20-cv-476 (TJM/DJS), 2020 WL 7389050,

at *3–5 (N.D.N.Y. Dec. 16, 2020) (slip copy).[4] DSM and Provitas eventually reached a confidential settlement. (First Weinand Affidavit ¶ 3.)

That brings us to the present case. On March 12, 2021, Provitas filed a Complaint against QIC in the U.S. District Court for the Eastern District of Texas seeking indemnity for any damages paid to DSM. (*See* Compl.) Provitas alleges five causes of action: a request for declaratory judgment under Texas Civil Practice and Remedies Code § 82.002 that QIC has a duty to indemnify it, (Compl. ¶ 39–44); violations of the Texas Deceptive Trade Practices Consumer Protection Act ("Texas DTPA") § 17.46(a)–(b), (Compl. ¶ 45–47); violations of the Federal Drug Administration's ("FDA") Current Good Manufacturing Practices, 21 C.F.R. § 110.80, (Compl. ¶ 48–51); breach of express warranty, (Compl. ¶ 52–57); and breach of the implied warranties of merchantability and fitness for a particular purpose, (Compl. ¶ 58–62).

QIC moved to dismiss for lack of personal jurisdiction under Federal Rule of Civil Procedure 12(b)(2) and moved in the alternative to transfer the case pursuant to 28 U.S.C. § 1404(a). (*See* Def.'s Mot. to Dismiss.) The court found that it had personal jurisdiction over QIC, but held that the forum selection clause within the parties' Mutual Confidentiality Agreement was mandatory, applicable, and enforceable. *Provitas, LLC v. Quality Ingredients Corp.*, No. 4:21-cv-00196, 2021 WL 5907790, at *6, *16 (E.D. Tex. Dec. 14, 2021) (slip copy). It then held that the public interest factors under Section 1404(a)

---

[4] The district court in New York later denied DSM's motion to amend its complaint. *DSM Nutritional Prods., LLC v. Provitas, LLC*, No. 1:20-cv-476 (TJM/DJS), 2022 WL 19731705 (N.D.N.Y. May 16, 2022) (slip copy).

favored adjudication in Minnesota and therefore granted QIC's motion to transfer the case to this District. *Id.* at *16–18.

QIC now moves for summary judgment, arguing that it is entitled to judgment as a matter of law on all of Provitas' claims. (Def.'s Mem. [Doc. No. 66] at 1, 7.) In particular, QIC asserts that a choice of law provision precludes Provitas' claims under Texas law, that no private right of action exists under the FDA's Current Good Manufacturing Practices, and that the breach of express and implied warranty claims lack evidentiary support. (*See id.* at 4, 8–15; Def.'s Reply [Doc. No. 74] at 2–12.) Provitas responds that its Texas claims are valid and that, alternatively, its claim for indemnity succeeds under Minnesota law. (Pl.'s Opp'n [Doc. No. 71] at 11–19.) It further contends that the evidence of impure vitamin D2 establishes that QIC breached its express and implied warranties. (*Id.* at 19–20.)

## II.    STANDARD OF REVIEW

Summary judgment is appropriate if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "A fact is 'material' if it may affect the outcome of the lawsuit." *TCF Nat'l Bank v. Mkt. Intelligence, Inc.*, 812 F.3d 701, 707 (8th Cir. 2016). And a factual dispute is "genuine" only if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). In evaluating a motion for summary judgment, the Court must view the evidence and any reasonable inferences drawn from the evidence in the light most favorable to the

nonmoving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

Although the moving party bears the burden of establishing the lack of a genuine issue of material fact, the party opposing summary judgment may not "rest on mere allegations or denials but must demonstrate on the record the existence of specific facts which create a genuine issue for trial." *Krenik v. Cnty. of Le Sueur*, 47 F.3d 953, 957 (8th Cir. 1995) (internal quotation marks omitted); *see Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Moreover, summary judgment is properly entered "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp.*, 477 U.S. at 322.

## III.   DISCUSSION

QIC moves for summary judgment on all of Provitas' claims. The Court will address them in turn.

### A.  Counts I and II – Violations of Texas Law

Provitas alleges two causes of action under Texas law. (Compl. ¶ 39–47.) First, it seeks a declaration that the Texas Civil Practice and Remedies Code § 82.002 requires QIC, as a manufacturer, to indemnify Provitas for its loss arising from DSM's action against it. (*Id.* ¶ 39–44.) Second, it alleges that QIC engaged in "false, misleading, or deceptive acts or practices" in violation of the Texas DTPA. (*Id.* ¶ 45–47.)

QIC argues that both of these claims fail because the choice of law provision contained in the Mutual Confidentiality Agreement requires the Court to apply Minnesota

law. (Def.'s Mem. at 8–9.) It further contends that Provitas' indemnification claim fails on the merits regardless of which state's law applies. (*Id.* at 9–13.)

In response, Provitas concedes that a conflict of law exists but asserts that the choice of law analysis is subject to constitutional limits. (Pl.'s Opp'n at 12–13.) It contends that QIC is subject to the laws of Texas as a result of consistently conducting business there with Provitas. (*Id.*)

### 1.  Choice of Law

To determine which body of law applies to a dispute, a federal court sitting in diversity applies the conflict of laws rules of the state in which it sits. *Klaxon Co. v. Stentor Elec. Mfg. Co.*, 313 U.S. 487, 494–96 (1941). Here, that is Minnesota.

"Before applying the forum state's choice-of-law rules, however, a trial court must first determine whether a conflict exists." *Prudential Ins. Co. of Am. v. Kamrath*, 475 F.3d 920, 924 (8th Cir. 2007) (citation omitted). A conflict exists "if the choice of one forum's law over the other will determine the outcome of the case." *Nodak Mut. Ins. Co. v. Am. Fam. Mut. Ins. Co.*, 604 N.W.2d 91, 94 (Minn. 2000).

In this case, both parties agree that a true conflict exists. (*See* Def.'s Mem. at 8–9; Pl.'s Opp'n at 12–13.) The Texas Civil Practice and Remedies Code § 82.002 creates a cause of action with no analogue in Minnesota law and Provitas did not plead a violation of any Minnesota statute addressing trade practices. The choice of law is therefore outcome-determinative. *See, e.g.*, *Nodak*, 604 N.W.2d at 94 (finding an actual conflict where North Dakota law permitted an insurer's subrogation claim but Minnesota law precluded such a claim); *Nw. Airlines, Inc. v. Astraea Aviation Servs., Inc.*, 111 F.3d 1386,

1392 (8th Cir. 1997) (affirming the district court's dismissal of a claim under the Texas DTPA where Minnesota law applied).

Minnesota courts traditionally enforce choice-of-law provisions.[5] *Hagstrom v. Am. Circuit Breaker Corp.*, 518 N.W.2d 46, 48 (Minn. Ct. App. 1994); *Milliken & Co. v. Eagle Packaging Co.*, 295 N.W.2d 377, 380 n.1 (Minn. 1980) (stating that the Minnesota Supreme Court is "committed" to honoring choice-of-law agreements). As long as the parties have acted in good faith, Minnesota courts will apply the substantive law of the state agreed to by the parties. *Hagstrom*, 518 N.W.2d at 49; *see also St. Jude Med. S.C., Inc. v. Biosense Webster, Inc.*, 818 F.3d 785, 788 (8th Cir. 2016) (holding that to enforce a choice of law provision the parties must have "acted in good faith and without an intent to evade the law."). Moreover, if the language is broad enough, a contractual choice-of-law provision may govern non-contractual claims when they are "closely related to the interpretation of the contract[]." *Nw. Airlines, Inc.*, 111 F.3d at 1392.

Here, the Mutual Confidentiality Agreement provides that the "legality, validity, enforceability and interpretation of this Agreement and the relationship of the parties hereunder shall be governed by the laws of the state of Minnesota, without giving effect to the principles of conflict of laws." (Mutual Confidentiality Agreement ¶ 12.)

This language encompasses both of Provitas' claims under Texas law. First, Provitas does not argue that the parties entered the agreement in bad faith or with an intent to evade

---

[5] Where a dispute involves an outcome-determinative conflict but no contractual choice-of-law provision, Minnesota courts proceed to apply the "better law" methodology adopted in *Milkovich v. Saari*, 203 N.W.2d 408 (1973). *Superior Edge, Inc. v. Monsanto Co.*, 964 F. Supp. 2d 1017, 1032 n.3 (D. Minn. 2013).

the law. (*See* Pl.'s Opp'n at 12–13.) The clause is therefore presumptively enforceable. *Hagstrom*, 518 N.W.2d at 49.

Second, the Eighth Circuit has held that a provision stating an agreement would "be governed by and interpreted in accordance with" Minnesota law applied to contract-based claims as well as to the plaintiff's claims for negligent performance, misrepresentation, deceptive trade practices, and unjust enrichment. *Nw. Airlines, Inc.,* 111 F.3d at 1392. As a result of applying Minnesota law, the court affirmed the dismissal of the plaintiff's claim under the Texas DTPA. *Id.* at 1392 n.4 ("[T]he deceptive trade practices claim rests on a statute not available under Minnesota law."). This direct precedent compels dismissal of Provitas' Texas DTPA claim.

Third, the clause here goes even further. It provides that not only the Mutual Confidentiality Agreement, but also the parties' entire "relationship" will be governed by Minnesota law, "without giving effect to the principles of conflict of laws." (Mutual Confidentiality Agreement ¶ 12.) This expansive phrasing dictates the application of Minnesota law to all of Provitas' claims, as each stems from its business "relationship" with QIC. *See, e.g.*, *Syngenta Seeds, LLC v. Warner*, No. 20-cv-1428 (ECT/BRT), 2021 WL 679289, at *7–8 (D. Minn. Feb. 22, 2021) (holding that a clause providing that the parties' agreement would be "governed by" South Carolina law "without giving effect to the conflicts of law provisions thereof," applied to the plaintiff's breach-of-contract claims, statutory trade-secret claim, civil-conspiracy claim, and claims for tortious interference with contract).

Instead of addressing the choice-of-law clause, Provitas argues that the U.S. Constitution permits the application of Texas law. (*See* Pl.'s Opp'n at 13.) Perhaps, but what the Constitution *permits* is distinct from—and broader than—what the parties' agreement *mandates*. The U.S. Constitution merely requires that the chosen state have a "significant contact or significant aggregation of contacts, creating state interests, such that choice of its law is neither arbitrary nor fundamentally unfair." *Allstate Ins. Co. v. Hague*, 449 U.S. 302, 313 (1981). Here, QIC is a party to the contract, is incorporated in Minnesota, and maintains its headquarters and manufacturing facilities in Minnesota. (Day Affidavit ¶ 4–5.) Moreover, the vitamin processing at the heart of this dispute occurred in Minnesota. (*Id.* ¶ 19.) In addition, the Court notes that Provitas did not allege these Texas claims when it first filed suit in this District, suggesting that it recognized and consented to the application of Minnesota law. (*See* Complaint in 20-cv-00806 (NEB/DTS) ¶ 47–78.) Under these circumstances, enforcing the choice-of-law provision is neither arbitrary nor unfair. *See, e.g.*, *St. Jude Medical S.C., Inc. v. Suchomel*, No. 19-cv-2400 (JRT/BRT), 2020 WL 1853653, at *5 (D. Minn. Apr. 13, 2020) (finding it constitutional to apply Minnesota choice-of-law provision because one party to the contract was incorporated in and had a place of business in Minnesota).

For these reasons, the Court finds that the choice-of-law provision in the Mutual Confidentiality Agreement requires the application of Minnesota law and precludes Provitas' Texas claims.

## 2.  Indemnity Under Minnesota Law

Having concluded that Minnesota law applies, the Court must next determine whether Provitas' indemnity claim survives summary judgment on the merits. QIC asserts that Provitas cannot rely upon a confidential settlement agreement to sustain an indemnity claim. (Def.'s Mem. at 9–10.) Further, QIC contends that Provitas cannot show that it breached a duty to Provitas. (*Id.* at 10–11.)

By way of response, Provitas argues that QIC had a duty to provide it unadulterated vitamin D2, presumably based on the Continuing Product Guaranty. (Pl.'s Opp'n at 3–4, 13–17.) QIC, in its reply, notes that Provitas did not allege a breach of duty or of contract based on the Continuing Product Guaranty and did not request leave to amend its Complaint to add either allegation. (Def.'s Reply at 5–9.) It therefore urges the Court to reject Provitas' arguments. (*Id.*)

Under the common law indemnity doctrine, "[a] right of indemnity arises when a party seeking indemnity has incurred liability due to a breach of a duty owed to it by the one sought to be charged, and such a duty may arise by reason of a contractual obligation." *Rice Lake Contracting Corp. v. Rust Env't & Infrastructure, Inc.*, 616 N.W.2d 288, 291 (Minn. Ct. App. 2000). While common law indemnity is an equitable doctrine, "a claim based on an express indemnification provision is a legal, rather than equitable, claim." *Johnson v. Johnson*, 902 N.W.2d 79, 85 (Minn. Ct. App. 2017); *In re RFC & RESCAP Liquidating Tr. Action*, 332 F. Supp. 3d 1101, 1128–30 (D. Minn. 2018) (explaining the difference between equitable and contractual indemnification).

Although Provitas does not explicitly differentiate between these two veins of indemnification, it declares that "Defendant provided an express guaranty of its workmanship and promised to indemnify and hold Plaintiff harmless with respect to the vitamin D2 produce." (Pl.'s Opp'n at 16.) This statement could only reasonably refer to the indemnity provision contained within the Continuing Product Guaranty. (*See* Continuing Product Guaranty ¶ 4.) As such, the Court construes Provitas' claim as one for contractual indemnification.

The Court agrees with QIC that any claim for indemnity based on the Continuing Product Guaranty is not properly before it. The Complaint nowhere mentions the Continuing Product Guaranty. (*See* Compl.) "[T]he proper procedure for advancing a new claim . . . is to file a motion to amend rather than insert into [plaintiff's] summary judgment briefing an issue she has not pleaded." *Jacqueline C. v. Kijakazi*, No. 21-cv-1612 (JRT/HB), 2022 WL 558052, at *3 (D. Minn. Feb. 24, 2022) (slip copy). Provitas has not moved to amend the Complaint and at this late stage the Court would not be inclined to grant such a motion. *See, e.g.*, *Hammer v. City of Osage Beach, Mo.*, 318 F.3d 832, 844–45 (8th Cir. 2003) (affirming denial of leave to amend where the plaintiff filed its second motion to amend fifteen months after the original complaint, after discovery had closed, and after the defendant had moved for summary judgment).

Moreover, even if the Court were to entertain its claim, Provitas has failed to submit its confidential settlement agreement with DSM for review.[6] "It is well-established in

---

[6] Provitas also has failed to address core elements of the indemnity provision. For example, Provitas has not discussed whether the destruction of the soy milk premix

Minnesota . . . that a party seeking indemnity for a settlement must show that the settlement was reasonable." *In re RFC*, 332 F. Supp. 3d at 1155 (citing *Brownsdale Coop. Ass'n v. Home Ins. Co.*, 473 N.W.2d 339, 342 (Minn. Ct. App. 1991)); *Osgood v. Med., Inc.*, 415 N.W.2d 896, 903 (Minn. Ct. App. 1987) ("Where the settlement was entered into before trial . . ., the party seeking indemnification must show the settlement was reasonable and prudent."). The parties disputed at oral argument whether Provitas has in fact provided the Court and QIC with a copy of the settlement, but neither party followed up with the Court after this exchange. The Court's review of the docket as well as email correspondence with Provitas' counsel from April 25 confirms that Provitas has not submitted the settlement agreement, either under seal or for in camera review. The Court cannot find reasonable a settlement which neither it nor the defendant has evaluated.

In sum, the parties' choice of law agreement precludes Provitas' Texas statutory claims. Applying Minnesota law, Provitas' claim for common law indemnity fails due to

---

constitutes the type of "injury" contemplated by the Continuing Product Guaranty. (*See* Continuing Product Guaranty ¶ 4.) Nor has Provitas explained how QIC is "prima facie" at fault for the injury when Provitas directed the cleaning protocols that resulted in the vitamin D2-D3 mixture. (*Id.*; Weber Decl. ¶ 10; Day Affidavit ¶ 20; Pl.'s Banken Dep. at 9:5–10:22.)

Moreover, the cases that Provitas cites in support of indemnification are distinguishable. (*See* Pl.'s Opp'n at 16–17.) First, both cases deal with the interpretation of "property damage" in insurance policies. *See Netherlands Ins. Co. v. Main Street Ingredients, LLC*, 745 F.3d 909, 914–17 (8th Cir. 2014) (interpreting "property damage"); *General Mills, Inc. v. Gold Medal Ins. Co.*, 622 N.W.2d 147, 151–2 (Minn. Ct. App. 2001) (interpreting "direct physical loss or damage to property"). Second, in both cases the property damage occurred because the FDA itself discovered a regulatory violation at the manufacturer's plant. *General Mills, Inc.*, 622 N.W.2d at 150 (describing the discovery of an unapproved pesticide); *Netherlands Ins. Co.*, 745 F.3d at 911 (describing the discovery of Salmonella bacteria). No comparable FDA discovery prompted DSM to destroy its soy milk premix. These cases are therefore not persuasive.

its pleading and evidentiary deficiencies. The Court therefore grants QIC summary judgment on Provitas' indemnity claims, Counts I and II.

### B.  Count III – Violation of the Current Good Manufacturing Practices

Next, Provitas alleges that QIC violated the FDA's Current Good Manufacturing Practices, 21 C.F.R. § 110.80. (Compl. ¶ 48–51.) QIC contends that no private cause of action exists for violations of the Current Good Manufacturing Practices, which are part of the Federal Food, Drug, and Cosmetic Act ("FDCA"). (Def.'s Mem. at 13–15.)

The FDCA provides that "all such proceedings for the enforcement, or to restrain violations, of this chapter shall be by and in the name of the United States." 21 U.S.C. § 337(a). The Supreme Court has opined that this provision "leaves no doubt that it is the Federal Government rather than private litigants who are authorized to file suit for noncompliance" with the FDCA. *Buckman Co. v. Plaintiffs' Legal Comm.*, 531 U.S. 341, 349 n.4 (2001). Applying *Buckman*, courts have rejected claims to directly enforce the FDCA.[7] *See, e.g.*, *Riley v. Cordis Corp.*, 525 F. Supp. 2d 769, 776–77 (D. Minn. 2009) (applying *Buckman* to a claim stemming from an injury allegedly caused by a medical device regulated under the FDCA); *Young v. PepsiCo, Inc.*, No. 20-cv-1486 (PAM/KMM), 2020 WL 4572067, at *1 (D. Minn. Aug. 8, 2020) (dismissing, pursuant to *Buckman*,

---

[7] Although direct enforcement of the FDCA is precluded, courts sometimes allow litigants to assert parallel state law claims based on FDCA-violative conduct. *See, e.g.*, *Riley*, 525 F. Supp. 2d at 775–77 ("For a state-law claim to survive, then, the claim must be premised on conduct that both (1) violates the FDCA and (2) would give rise to a recovery under state law even in the absence of the FDCA."); *Angeles v. Medtronic, Inc.*, 863 N.W.2d 404, 409–22 (Minn. Ct. App. 2015). Provitas' Count III seeks to directly enforce the FDCA and thus does not implicate this caselaw.

plaintiff's claim that PepsiCo violated the FDCA by "mislabeling" Mountain Dew Voltage as "charged with raspberry citrus flavor" when it contained no raspberry). As they form part of the FDCA's regulatory regime, the Current Good Manufacturing Practices cannot be enforced through a private action. *See* 21 U.S.C. § 342 (describing "adulterated" food); 21 C.F.R. § 110.80 (2023) (prescribing methods to prevent food from becoming "adulterated" within the meaning of the FDCA).

Provitas does not attempt to dispute this case law. Indeed, its brief does not address its FDCA claim at all. (*See generally* Pl.'s Opp'n.) Precedent unambiguously prevents private actions for violations of the FDCA and Provitas has not met its burden on summary judgment to show otherwise. Accordingly, the Court grants summary judgment to QIC on Provitas' claim for a violation of the FDCA.

### C. Count IV – Breach of Express Warranty

For its fourth cause of action, Provitas alleges breach of an express warranty. (Compl. ¶ 52–57.) Specifically, Provitas contends that by signing the Continuing Product Guaranty, QIC expressly warranted that the products it shipped to Provitas would arrive unadulterated within the meaning of the FDCA. (Pl.'s Opp'n at 20.) In addition, Provitas asserts that QIC expressly warranted that the packages it produced and labeled contained the vitamin D2 as described on the label. (Compl. ¶ 53–54.)

QIC argues that it never provided the express warranties alleged by Provitas and that the record lacks evidence to the contrary. (Def.'s Mem. at 15.) It further asserts that Provitas did not plead a violation of the Continuing Product Guaranty as the basis for its breach of warranty claim and cannot informally amend its Complaint through its opposition

brief at the summary judgment stage. (Def.'s Reply at 11–12.) In addition, QIC contends that Provitas cannot prove the vitamin D2 arrived "adulterated" or "misbranded" under the FDCA. (*Id.*)

Under Minnesota law, a seller creates an express warranty through an affirmation of fact, a promise, or a description relating to the products that becomes part of the basis of the bargain between the parties. Minn. Stat. § 336.2-313(1)(a–c) (2023). "To establish a warranty claim the plaintiff must basically prove: the existence of a warranty, a breach, and a causal link between the breach and the alleged harm." *Peterson v. Bendix Home Sys.*, Inc., 318 N.W.2d 50, 52–53 (Minn. 1982). Here, Provitas points to the Continuing Product Guaranty and the vitamin D2 container labels as the source of QIC's express warranties.

The Continuing Product Guaranty provides that nothing shipped to Provitas from QIC will be "adulterated or misbranded" within the meaning of the FDCA. (Continuing Product Guaranty ¶ 1.) The Court again notes that Provitas did not plead the Continuing Product Guaranty as the basis for its claim, (*see* Compl. ¶ 52–57), which some courts hold is reason enough to dismiss an express warranty claim. *See, e.g.*, *In re Bisphenol-A (BPA) Polycarbonate Plastic Prods. Liab. Litig.*, 687 F. Supp. 2d 897, 905–06 (W.D. Mo. 2009) ("The Supreme Court's decision in *Iqbal* required Plaintiff to identify the basis for, if not the content of, the alleged warranty."); *Hartley v. Sig Sauer, Inc.*, No. 4:18-cv-00267 (HFS), 2019 WL 11639620, at *5 (W.D. Mo. Mar. 25, 2019) (slip copy) ("Plaintiffs must identify the statements . . . that form the basis for their claims of an express warranty.").

Nor did Provitas name the Continuing Product Guaranty during discovery. When asked by QIC to identify any "written or printed document" allegedly creating an express

warranty, Provitas responded: "Defendant expressly warranted that it was capable of producing Vitamin D2 powder for Plaintiff as ordered by Plaintiff's customer. Defendant expressly warranted that packages it produced and labeled as Vitamin D2 powder contained the product as stated on the label." (Pl.'s Resps. to Def.'s Second Set of Interrogs. at 7; *see also* Weber Decl. ¶ 6 (stating that QIC represented that "it had the ability to process vitamin D2 from a concentrated liquid form to a powder form suitable for human consumption.").) For the same reason it could not support the indemnity claim, the Court is dubious of Provitas asserting the Continuing Product Guaranty as the source of an express warranty only in opposition to summary judgment.

Furthermore, even assuming that the Continuing Product Guaranty created an express warranty, Provitas has not raised a genuine issue of disputed material fact that QIC breached it. First, Provitas asserts that QIC's breach resulted from performing a dry clean between ingredients rather than a CIP. (*See, e.g.*, Pl.'s Opp'n at 7–8; *id.* at 14 ("Plaintiff asserts Defendant improperly cleaned its drying tower(s) between production runs of vitamin D3 and vitamin D2.").) But the record evidence shows that Provitas directed the cleaning protocols and instructed QIC to perform a dry clean.[8] (Weber Decl. ¶ 10; Day

---

[8] Provitas suggested at oral argument, for the first time, that there is a question of disputed material fact as to whether it directed QIC to process the vitamin D3 before the vitamin D2 and to perform a dry clean in between. The Court disagrees.

Provitas submitted a document entitled "D2-400SD (D222)," which it refers to as the specifications for processing the vitamin D2. (*See* Bodden Decl. ¶ 3; Bodden Decl., Ex. A-5 (D2 Processing Specifications); Weber Decl. ¶ 10.) Under the heading "KEY PROCESS PERIMETERS," this document states: "MIXER: MANDATORY CIP PRIOR TO PRODUCTION" and "DRYER: MANDATORY CIP PRIOR TO PRODUCTION." (*Id.*) The document further states that vitamin D2 should comprise 44% of the final powder

Affidavit ¶ 20; Pl.'s Banken Dep. at 9:5–10:22; Def.'s Resps. to Pl.'s Second Set of Interrogs. ("In the case of D2, Provitas directed the sequence of products run with dry cleans only between their products running back-to-back[.]").)

Second, Provitas asserts that QIC created "adulterated" vitamin D2, (Pl.'s Opp'n at 20), but it does not direct the Court to any federal statute, regulation, or case law explaining the meaning of "adulterated" per the FDCA. (*Id.* at 19–20.) Nor does Provitas cite to any evidence in the record demonstrating that the vitamin D2 was "adulterated" under the statute. To the contrary, Provitas' President emailed DSM stating that the vitamin D2 was "produced in specification" and that Provitas had found "normal batch-to-batch yield loss and carryover from the spray drying process when a dry-clean step is performed between products in a single campaign." (Weber Email.) If anything, this email suggests that Provitas believed the vitamin D2 conformed to industry expectations. Without clearer

---

formula, with the remainder composed of maltodextrin and "hi cap 100" in portions of 26% and 30%, respectively. (*Id.*)

At first glance, the D2 Processing Specifications appear to show that Provitas requested a CIP rather than a dry clean between QIC's processing of the vitamin D3 and vitamin D2. However, the document is dated October 10, 2017. (*See* D2 Processing Specifications.) Its creation appears to post-date both QIC's processing of the vitamins and DSM's complaint to Provitas about the mixture. (*See* Weber Decl. ¶ 10–15 (describing processing in May and complaint from DSM in August, 2017).) Neither party has addressed this document or its date.

The Court therefore finds that absent further explanation, the D2 Processing Specifications do not raise a question of disputed material fact that Provitas requested a CIP—rather than a dry clean—before the vitamin D2 processing. And Provitas has not pointed to any other evidence suggesting that it did not provide the sequencing and cleaning specifications to QIC. Conclusory statements that a question of fact exists, unsupported by citation to the record, are insufficient to survive summary judgment.

pleading or any supporting evidence, the Court cannot find that QIC breached the Continuing Product Guaranty.

As for the creation of a warranty through the label on the vitamin D2 containers, this theory also fails. Most importantly, the only record evidence of the labels—a photo and Mr. Banken's testimony—establishes that Provitas created the labels, not QIC. (Def.'s Banken Dep. at 69:3–70:16; Def.'s Banken Dep. at PROVITAS 001965.) The label conspicuously states that the package is "Guaranteed By: Provitas, LLC," listing Provitas' address and telephone number. (Def.'s Banken Dep. at PROVITAS 001965.) Provitas does not address the labels at all in its briefing, let alone explain how a label that it created and which lists it as guarantor constitutes an affirmation by QIC. (*See* Pl.'s Opp'n at 19–20); Minn. Stat. § 336.2-313(1)(a–c).

The Court finds that Provitas' conclusory allegations are insufficient to raise a genuine issue of disputed material fact on summary judgment as to whether QIC breached an express warranty. Accordingly, the Court grants summary judgment to QIC on that claim, Count IV.

### D. Count V – Breach of the Implied Warranties of Merchantability and Fitness for a Particular Purpose

Finally, Provitas alleges that QIC breached the implied warranty of merchantability and the implied warranty of fitness for a particular purpose. (Compl. ¶ 58–62.) It argues that the carryover of vitamin D3 rendered the vitamin D2 "defective" and unfit for "its intended use as a vegan ingredient or product." (Pl.'s Opp'n at 20.) In response, QIC

contends that these claims fail because neither party knew DSM's ultimate purpose for the vitamin D2. (Def.'s Mem. at 15.)

Under Minnesota law, "[t]o establish breach of an implied warranty of fitness for a particular purpose, a plaintiff must prove that: (1) the seller had reason to know of the buyer's particular purpose; (2) the seller had reason to know the buyer was relying on the seller's skill or judgment to furnish suitable goods; [and] (3) the buyer actually relied on the seller's skill or judgment." *Travelers Prop. Cas. Co. of Am. v. Saint-Gobain Tech. Fabrics Canada Ltd.*, 474 F. Supp. 2d 1075, 1084 (D. Minn. 2007) (citing *Willmar Cookie Co. v. Pippin Pecan Co.*, 357 N.W.2d 111, 115 (Minn. Ct. App. 1984)).

Here, Provitas' claim fails on the first prong. Provitas admitted that it "was not aware of the intended purpose for the Vitamin D2 powder, or who the ultimate customer would be after supplying the same to its customer." (Pl.'s Resps. to Def.'s Second Set of Interrogs. at 4.) QIC likewise stated that it "did not know who the Vitamin D2 powder was going to." (Def.'s Resps. to Pl.'s Second Set of Interrogs. at 5.) Confirming this, Provitas' Purchase Order contains no details about DSM or its particular purpose for the vitamin D2. (*See* Provitas Purchase Order.) Mr. Weber declared that QIC was aware that "ultimate purchasers of QIC's processed vitamins would be incorporated by food manufacturers." (Weber Decl. ¶ 14.) Even if true, this statement does not establish that QIC knew of the vitamin D2's vegan purposes. *See Travelers Prop. Cas. Co. of Am.*, 474 F. Supp. 2d at 1084–85 (holding that knowledge of a product's "general purpose," alone, is insufficient to establish knowledge of its particular purpose). Without knowledge of the intended

purpose, Provitas' claim for breach of an implied warranty of fitness for a particular purpose is a nonstarter.

Turning to the implied warranty of merchantability, Minnesota law requires goods to be fit for their "ordinary purposes." Minn. Stat. § 336.2-314 (2023); *Duxbury v. Spex Feeds, Inc.*, 681 N.W.2d 380, 393 (Minn. Ct. App. 2004) (citing Minn. Stat. § 336.2-314(2)(c)). Neither party devotes any attention in their briefing to the ordinary purpose of vitamin D2. According to Mr. Weber, "the sole use for vitamin D2 is a supplement for human consumption." (Weber Decl. ¶ 10; *see also id.* ¶ 8 ("Vitamin D2 is a desired supplement for human consumption.").)

Assuming this to be true, Provitas has produced no evidence that the presence of some amount of vitamin D3 rendered the vitamin D2 unconsumable. Minnesota courts have found food products unfit for consumption when they are spoiled or otherwise cause illness. *See, e.g.*, *Duxbury*, 681 N.W.2d at 393 (finding cow feed unfit for its ordinary and intended use because it sickened the cows); *Willmar Cookie Co.*, 357 N.W.2d at 114 (affirming jury verdict that pecans which arrived "moldy and discolored," and which customers later complained were "awful" and "rancid," were not merchantable for human consumption). Nothing in the record demonstrates that QIC's processing resulted in a spoiled or sickening mixture of vitamin D2.

And even if the Court construes vitamin D2's "ordinary purpose" more narrowly as fit for incorporation into other foods as a supplement, Provitas has provided no evidence that it is unfit in this capacity. The only evidence in the record is Mr. Weber's email stating that the vitamin D2 was "produced in specification" and that Provitas found "normal batch-

to-batch yield loss and carryover from the spray drying process when a dry-clean step is performed between products in a single campaign." (Weber Email.) If the quantity of vitamin D3 contained in the final product reflected "normal" carryover, then the vitamin D2 could presumably be used for its ordinary purposes. *Cf. In re Lyman Good Dietary Supplements Litig.*, No. 17-cv-8047 (VEC), 2018 WL 3733949, at *10 (S.D.N.Y. Aug. 6, 2018) (finding it plausible that a dietary supplement was not fit for its ordinary purpose where it contained a substance that had harmful side effects, was banned by "major anti-doping institutes," and was listed in the Controlled Substances Act). There is simply no evidence before the Court that the difference between vitamin D2 and D3 matters outside the context of vegan and vegetarian food products.

It is Provitas' burden on summary judgement to either cite law in its favor or identify sufficient evidence to create a genuine issue of disputed material fact. The Court accepts the reasonable proposition that at some quantity, the presence of vitamin D3 renders vitamin D2 no longer merchantable as such. But Provitas has not pointed to a contract provision, invoice specification, federal regulation, or expert opinion marking that threshold. Absent such guidance, only speculation supports Provitas' proposition. The Court cannot determine on this record that the vitamin D2 was unfit for its ordinary purpose, whatever that may be.

In short, Provitas' claim for breach of the implied warranty of fitness for a particular purpose fails because QIC did not know the intended purpose of the vitamin D2. Its claim for breach of the implied warranty of merchantability fails for lack of any evidence. Accordingly, the Court grants summary judgment to QIC on these claims, Count V.

IV.     **CONCLUSION**

Based on the submissions and the entire file and proceedings herein, **IT IS**

**HEREBY ORDERED** that:

1.  QIC's Motion for Summary Judgment [Doc. No. 65] is **GRANTED**.


**LET JUDGMENT BE ENTERED ACCORDINGLY.**


Dated: June 12, 2023                              s/ Susan Richard Nelson
                                                  SUSAN RICHARD NELSON
                                                  United States District Judge